RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0153p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DAVID JONES,

*Plaintiff-Appellant*,

*v.*

No. 19-5143

CLARK COUNTY, KENTUCKY; BERL PERDUE, JR. and
LEE MURRAY, Individually,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:15-cv-00337—Robert E. Wier, District Judge.

Argued: October 25, 2019

Decided and Filed: May 18, 2020

Before: CLAY, STRANCH, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky,
for Appellant. Robert C. "Coley" Stilz, III, KINKEAD & STILZ, PLLC, Lexington, Kentucky,
for Appellees. **ON BRIEF:** Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY,
Prospect, Kentucky, for Appellant. Robert C. "Coley" Stilz, III, D. Barry Stilz, KINKEAD &
STILZ, PLLC, Lexington, Kentucky, for Appellees.

CLAY, J., delivered the opinion of the court in which STRANCH, J., joined, and
MURPHY, J., joined in part. MURPHY, J. (pp. 26–40), delivered a separate opinion concurring
in part and dissenting in part.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.   Plaintiff David Jones appeals from the district court's order granting summary judgment to Defendants Clark County, Kentucky; Clark County Sheriff Berl Perdue; and Clark County Sheriff's Deputy Lee Murray, in this case alleging malicious prosecution under 42 U.S.C. § 1983.   For the reasons set forth below, we **REVERSE IN PART** and **AFFIRM IN PART** the district court's order.   We **REVERSE** the district court's order with respect to the grant of summary judgment and qualified immunity for Murray and **REMAND** the case for trial.   We **AFFIRM** the district court's order granting summary judgment with respect to all other Defendants.

## I.  BACKGROUND

### A.  Factual History

In October 2013, Lexington, Kentucky Metro Police Detective ("LMPD") David Flannery tracked the source of a thirty-nine-second video of child pornography to a device that had connected to the internet via a router with an IP address located in Clark County, Kentucky. The video was being shared via the Ares peer-to-peer file-sharing network.   Detective Flannery proceeded to contact Clark County Sheriff's Deputy Lee Murray about the video.   Deputy Murray then obtained a subpoena of AT&T Internet Services, the internet service provider associated with the router's IP address.   AT&T identified Plaintiff David Jones as the subscriber associated with the IP address and provided Murray with Jones' personal information, including his address in Winchester, Kentucky—located in Clark County.   Based upon this information, Deputy Murray secured a search warrant for Jones' address.   He noted in his affidavit in support of the search warrant that Jones was not yet a "suspect" in the case and that Jones did not necessarily have "possession" of the device(s) connected to the child pornography.   R. 8-3, PageID # 106.   Murray claimed in his deposition during discovery in the present case that he did not identify a "suspect" in his affidavit because "there could be some other occupants inside the residence besides the person that [the IP address is] owned by or leased to."   R. 62-2, PageID #

617.  According to the affidavit, the purpose of the search was to locate the electronic device(s) used to upload and/or store the illegal video; as well as any "hard copies of images of minors engaged in sexual performances" or other proof of child pornography in the residence.  R. 62-10, PageID # 1134.

Murray and his supervisor, Captain Brian Caudill, executed the search warrant along with three other deputies and seized a tablet, cell phone, printer, modem, Xbox gaming console, and three DVDs from Jones' residence.  The officers handcuffed Jones as soon as they entered his home and after completing the search they brought him to the Sheriff's Office for further questioning.  In his deposition testimony Murray does not clarify the basis for this arrest, explaining only that "there was a download of child pornography associated with an IP address of a router that was in his apartment," and that when Murray arrived at the apartment Jones "was the only one there."  R. 62-2, PageID # 630.

In his deposition, Deputy Murray also admitted that he knew that "child pornography could be downloaded from an IP address by means other than the person who lived at that address actually being involved in that download."  R. 62-2, PageID # 631.[1]  Murray's Uniform Citation for Jones' arrest states that: "The suspect was arrested and taken to the [Clark County Sheriff's Office] where he was interviewed.  He states that no other person has the password to his computer tablet, to his wireless modem and that no one uses his cell phone.  He stated on Oct. 11, 2013 he was home alone, he also states that he has not downloaded any child pornography."  R. 62-10, PageID # 1124.  This section of the Uniform Citation is entitled "Charges and Post-arrest Complaint."  *Id.*

Jones' case was presented to a grand jury on December 12, 2013. In his testimony before the grand jury, Murray clarified that he arrested Jones because of the evidence that a download of child pornography occurred at the IP address associated with Jones' residence.  Murray testified that it was not until after Jones was Mirandized that Jones revealed the facts asserted in the Uniform Citation  to Murray—that Jones lived alone, was alone the night of the download,

---

[1]The depositions of Captain Caudill, Prosecutor Engel, and Detective Flannery confirm that they also knew an individual's IP address could be hacked by a third party.

and had not shared his router password with anyone.[2]  Jones was subsequently indicted by the grand jury on one count of promoting a sexual performance by a minor under sixteen years of age.

Back in December 2013, Murray had brought Jones' cell phone and computer to the LMPD for forensic testing.  On January 11, 2014, after Jones was indicted, Murray received the results of the forensic testing.  It failed to yield a copy of the pornographic video that had been uploaded at Jones' IP address.  According to Murray, the tablet was "too new" for a complete forensic exam to be performed.  R. 62-2, PageID # 678–79.  The phone was thoroughly examined, but all that was discovered was an audio file that appeared to have been partially downloaded through the Ares program.

There is significant ambiguity in the record as to whether the two prosecutors in Jones' case were informed of the results of this forensic test or whether Jones' public defender, Valetta Browne, was as well.  Murray asserted in deposition testimony that prosecutor Heidi Engel "was made immediately aware as soon as we got the report back."  R. 62-2, PageID # 676.  Murray does not provide further details on when this conversation took place and when asked what Engel's reaction to the negative forensics results were, Murray stated "I don't remember what she said." *Id.* at PageID # 684.  Moreover, Prosecutor Charles Johnson admitted in deposition testimony that the copy of Murray's investigation notes that the prosecutors had in their case file did not include Murray's January 11, 2014, entry indicating that the forensic results on the devices came back negative for child pornography.  The prosecutors' copy of Murray's notes ends at the entry indicating that the devices have been sent to LMPD for testing.  While Johnson remembers being informed that the test results were negative, he has no documentation showing when he or prosecutor Engel were informed of the results.

Engel initially testified in her deposition that while she remembers "a time that [she] realized that the devices had been tested," she does not actually recall being informed of the test

---

[2]In his deposition in the present case, Murray stated that the reason he came to believe Jones committed the crime and that he had probable cause to arrest Jones was that in the interrogation at the Sheriff's Office Jones revealed "[t]hat no one had access to his router password, no one had access to his computer, it was password-protected, and he said that no one used his phone.  On the date and time that the download was done, he advised that no one else was there but him at that time."  R. 62-2, PageID # 637–38.

results nor does she recall turning them over to Jones' public defender. R. 62-7, PageID # 975–76. She does say that in general "[w]e have open discovery here, have had since I've been here. We copy everything we have and give it to the defense." *Id.* at PageID # 976. Later in her deposition, she appears to contradict herself with respect to being informed of the test results, stating "I recall Detective Murray saying that the results were there weren't any – the image and the video . . . was not on the phone nor the tablet." R. 62-7, PageID # 979–80. However, at no point does she state when Detective Murray informed her of the results. In fact, when asked if she believed that there was documentation of when Murray told her about the results she said "[p]robably not, no." *Id.* at PageID # 1013. She also claims, when asked a second time about communicating the test results to Jones' public defender, "I believe that there were discussions that the analysis of the devices did not reveal the image that was found in the file-sharing program or any other pornographic images, and I believe that is discussed as well in that motion to dismiss." *Id.* at PageID # 1019.[3] In any event, the prosecutors continued the proceedings against Jones.

In November 2014, Browne commissioned an alleged forensics expert, Lars Daniel, to conduct a forensic analysis of Jones' phone and tablet. Like the Lexington police, he also found no evidence of child pornography on either of the devices. Unlike the Lexington report he found no evidence "that the defendant ever used a peer to peer file sharing program such as Ares." R. 4-4, PageID # 56. Browne partially based her motion to dismiss on Daniel's negative results. This motion was denied. The court did decrease Jones' bond, and after posting the reduced bond, Jones was released from jail on December 15, 2014—nearly fourteen months after his arrest.

On April 2, 2015, the charges against Jones were dismissed without prejudice, on the Commonwealth's own motion. Engel stated that at that point:

> [There were] competing expert reports with respect to whether or not that device had the Ares access, and that complicated the facts even more, and we felt like in the spirit of justice that this case needed to be, you know, investigated perhaps. At that point there's competing expert reports, and you're looking at a standard of

---

[3]On December 9, 2014, Browne filed a Motion to Dismiss the criminal charge against Jones. Contrary to Engel's testimony, the Motion does not mention the Lexington police examination.

beyond a reasonable doubt, and we believed in the fairness of justice that we would dismiss it without prejudice. If additional evidence was uncovered that changed that, then obviously that matter could be addressed in the future.

R. 62-7, PageID # 1022–23. Johnson asserted in his deposition in this case that the decision to dismiss was made because the prosecutors determined that a conviction was unlikely given the conflicting forensic evidence (*i.e.*, the state's evidence of the Ares downloaded music file and the Daniel report). He said of the Daniel report:

> A:   [I]t was different from Lexington to the extent that there was no Ares sharing file. The reason that's important is the Lexington Police Department says there was one; the defendant says there was not. That's an issue that is a provable omission or the ability to impeach someone that indicates their guilt. The new report said it wasn't there, and that was what I considered to be a significant difference.
>
> Q:   And that led you to the conclusion in your discretion to dismiss the case without prejudice?
>
> A:   That's why we did do it. That's why I recommended it.

R. 62-8, PageID # 1092.

## B. Procedural History

Plaintiff Jones filed the present suit on November 11, 2015, seeking damages pursuant to 42 U.S.C. § 1983 for the alleged violation of his constitutional rights stemming from his arrest and prosecution. He asserted that his Fourth, Fifth, and Fourteenth Amendment rights were violated, that Defendants engaged in a malicious prosecution of him under both state and federal law, that Defendants were negligent and grossly negligent, and that they intentionally inflicted emotional distress upon him.

On August 3, 2016, the district court granted Defendants' motion to dismiss Jones' complaint. This Court reversed and remanded. *Jones v. Clark Cty., et al.*, 690 F. App'x 334 (6th Cir. 2017). In doing so, we observed that "Jones contends that Officer Murray misled the prosecutor, as well as the grand jury, through his deficient and reckless investigation and the critical omission of material evidence, namely that Jones's electronic devices contained no pornography." *Id.* at 336. Therefore, "[p]ursuant to *King* [*v. Harwood*, 852 F.3d 568 (6th Cir.

2017)], Jones has presented sufficient questions of material fact to overcome the defendant officer's motion to dismiss." *Id.*

Discovery then ensued. On February 14, 2019, after discovery was concluded, the district court granted summary judgment to Defendants and dismissed all of Jones' state and federal law claims. The district court held that Jones' federal malicious prosecution claim failed because there was probable cause for his arrest and prosecution. Additionally, it found that the officers involved in his arrest and prosecution were entitled to qualified immunity because there was no constitutional violation in this case and, if there had been a violation, there was no showing that there was clearly established law at the time of Jones' arrest that prohibited the officers' action. This timely appeal followed.

## II. DISCUSSION

### A. Summary Judgment for Defendants

#### 1. Standard of Review

We review the district court's order granting summary judgment for Defendants *de novo*. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997). To be entitled to summary judgment, Defendants must have demonstrated that there was no genuine dispute as to any material fact, thereby entitling them to judgment as a matter of law. Fed. R. Civ. P. 56(a). A "material" fact is one which "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This Court must consider all facts and inferences therefrom in the light most favorable to the non-moving party. *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). In this case, the non-moving party is Jones. Importantly, a court may not "weigh the evidence and determine the truth of the matter" in deciding a motion for summary judgment. *Anderson*, 477 U.S. at 249. "Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Wathen*, 115 F.3d at 403. However, if the evidence is "merely colorable" or "not significantly probative," then "summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

The burden of demonstrating the absence of a genuine dispute of material fact first rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party can meet this burden, the burden shifts to the non-movant to establish a "genuine issue" for trial via "specific facts." *Id.* at 324. Additionally, the Supreme Court has held that Rule 56 requires entry of summary judgment against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

### 2. Summary Judgment for Defendant Murray

To begin, Jones only contested the grant of summary judgment for Defendants on his federal and state malicious prosecution claims. The district court acknowledged this in its order granting summary judgment. Thus, on appeal this Court only considers whether the district court inappropriately granted summary judgment for Defendants on Jones' malicious prosecution claims.

Under federal law, a plaintiff must prove four elements to establish a malicious prosecution claim: (1) that a criminal prosecution was initiated against the plaintiff and that the defendant "made, influenced, or participated in the decision to prosecute;" (2) that the state lacked probable cause for the prosecution; (3) that the plaintiff suffered a deprivation of liberty because of the legal proceeding; and (4) that the criminal proceeding was "resolved in the plaintiff's favor." *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010).

### i. Probable Cause for Jones' Arrest

This Court has held that an officer "possesses probable cause when, at the moment the officer seeks the arrest, 'the facts and circumstances within [the officer's] knowledge and of which [she] had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense.'" *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (quoting *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964)). The Supreme Court has observed that a "probable cause determination . . . does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands." *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975). Moreover, this

Court has held that the "prudent person standard" in the tests for probable cause to search and probable cause to arrest are "the same." *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996) (finding that "[i]f it was reasonable to obtain a search warrant, it had to be equally reasonable to obtain the arrest warrant").

A probable cause determination is based upon the "totality of the circumstances" and must consider "both the inculpatory and exculpatory evidence." *Wesley*, 779 F.3d at 429 (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)). That means an officer cannot "'simply turn a blind eye' toward evidence favorable to the accused," *id.* (quoting *Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999)), nor "ignore information which becomes available in the course of routine investigations," *Fridley v. Horrighs*, 291 F.3d 867, 873 (6th Cir. 2002). That said, "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers*, 188 F.3d at 371. However, Jones need only make a "minimal showing of credibility . . . that the defendants did not have probable cause." *Yancey v. Carroll Cty.*, 876 F.2d 1238, 1243 (6th Cir. 1989). Unless "there is only one reasonable determination possible," this is a jury question. *Fridley*, 291 F.3d at 872 (citations omitted).

Jones was charged with promoting a sexual performance by a minor. Ky. Rev. Stat. § 531.320. "A person is guilty of promoting sexual performance by a minor when knowing the character and content thereof, he produces, directs or promotes any performance which includes sexual conduct by a minor." *Id.* "Promote" means "to prepare, publish, print, procure or manufacture, or to offer or agree to do the same." Ky. Rev. Stat. § 531.300(7). And under Kentucky law the "statute is violated when one either actively or passively prepares, agrees, or brings forth through their efforts the visual representation of a minor in a sexual performance before an audience." *Clark v. Commonwealth*, 267 S.W.3d 668, 678 (Ky. 2008). Thus, if there was probable cause to believe that Jones promoted the sexual performance of a minor by uploading the unlawful video through his router, then there was probable cause to arrest him.

Viewing the facts in Jones' favor, Murray's statement that he "arrested" Jones and his notation that Jones "was arrested and taken to the CCSO where he was interviewed," shows that Jones was arrested at his home. R. 62-2, PageID # 630; R. 62-10, PageID # 1124. Because

Murray had only secured a search warrant when he apprehended Jones, he needed probable cause for the arrest. At the point of arrest, Murray and his fellow officers knew that Jones owned the router associated with the illegal download. That Jones was alone the night of the download, that his router was password-protected, and that he had heard of the Ares program from a computer class he had taken was determined only after Jones was apprehended and then interrogated.

The fact that Jones owned the router that LMPD records indicated was used to upload child pornography and that the router was located in Jones' apartment could "warrant a prudent man in believing that the [Jones] had committed or was committing an offense." *Wesley*, 779 F.3d at 429. In *United States v. Hinojosa*, we held that officers had probable cause to secure a search warrant to search the defendant's residence because officers had established that an IP address used to transmit child pornography was registered to the defendant and that the defendant resided at the registered address. 606 F.3d 875, 885 (6th Cir. 2010). Then, in *United States v. Gillman*, we held that the possibility that someone could have accessed the defendant's wireless network without his permission, "does not negate the fair probability that child pornography emanating from an IP address will be found on a computer at its registered residential address." 432 F. App'x 513, 515 (6th Cir. 2011). While both of these cases involved search warrants, our holding in *Greene* that probable cause for a search and arrest turn on the same evidence is instructive. If the nexus between an IP address and a suspect's residence connecting him to the upload or transfer of child pornography justifies a search of that residence, then, depending upon the nature and existence of additional information turned up by the search, it might also justify an arrest of the residence's occupant.

Jones does not point to any cases in which a court has distinguished between probable cause for a search and an arrest under analogous facts. He instead emphasizes that Murray did not name Jones as a suspect in his affidavit for a search warrant, that Jones' router could have been hacked, and that there was no physical evidence establishing that Jones possessed the unlawful video. But probable cause is an objective standard, and both the facts in this case and the principles in the relevant case law point towards a finding that Murray had probable cause to arrest Jones. Jones' claim that Murray needed to have Jones' devices forensically examined

before arresting Jones goes too far. This position conflates the probable cause standard with the reasonable doubt standard and would impose an untenable requirement on police officers to exhaustively eliminate exculpatory possibilities presented by their investigations before arresting someone, despite having probable cause to do so.[4]

Notwithstanding that the charges against Jones were eventually dismissed, it is reasonable to think that because an individual owns a router that was indisputably used to upload child pornography, that individual may have been the one to have uploaded the unlawful material. This may not constitute enough evidence to secure a conviction, and the possibility of hacking should certainly be considered, but probable cause allows for such contingencies. Probable cause inquiries do "not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands." *Gerstein*, 420 U.S. at 121. Therefore, Jones has not demonstrated the existence of a genuine issue regarding probable cause for his initial arrest.

### ii. Probable Cause for Jones' Continued Detention

This Court has also held that a malicious prosecution claim can involve "continued detention" without probable cause. *Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999); *Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006) (recognizing the "subset of malicious prosecution claims which allege continued detention without probable cause"). This principle was affirmed in the recent case of *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (holding that "the § 1983 version of malicious prosecution is not limited to the institution of proceedings; it can also support a claim for continued detention without probable cause") (citations omitted).

---

[4]Jones also repeatedly asserts that Murray misrepresented material facts or outright lied during his grand jury testimony. Whether this is accurate or not, grand jury testimony is entitled to absolute immunity and a grand jury indictment establishes a rebuttable presumption of probable cause for a prosecution. *King v. Harwood*, 852 F.3d 568, 587–88 (6th Cir. 2017). This presumption can be rebutted through a showing that an officer made false statements or fabricated evidence "prior to and independent" of their grand jury testimony. *Id.* It is unclear what statements or evidence provided by Murray "prior to and independent" of his testimony could be characterized as false. Even if Jones could rebut the presumption of probable cause created by the grand jury indictment, his arrest and prosecution (at least until the forensic tests on his devices were performed) were independently supported by probable cause.

In the present case, there are genuine issues of material fact as to whether probable cause for Jones' continued detention dissolved once Murray received the results of the forensic examination on January 11, 2014. It could be reasonably inferred that the Commonwealth lacked the evidence it needed to continue its prosecution of Jones once the forensic examination failed to connect Jones' devices with the video. In fact, the prosecutors admitted that it was the weakness of the forensic report relative to Daniel's report that justified the dismissal of charges.

The ambiguity surrounding what the prosecutors knew regarding the forensic examination is important to this point. It is unclear from the record whether and when Johnson and Engel were fully informed of the forensic examination results by Murray or someone else at the Sheriff's Office. Thus, a jury must decide whether probable cause existed after January 11, 2014, and, if so, whether Murray delayed a further probable cause determination by avoiding or neglecting to inform prosecutors of the test results. While Murray had no obligation "to investigate further or to look for additional evidence which may exculpate the accused," *Ahlers*, 188 F.3d at 371, he could not ignore the forensics results that became "available in the course of routine investigations," *Fridley*, 291 F.3d at 873. As noted above, it was Murray himself who sent the devices to Lexington for testing. And, while Murray contends that it was not "[his] job" to seek Jones' release from jail after receiving the forensics results, it was also not his job to withhold material information from prosecutors or otherwise mislead them into pursuing an unsupported prosecution. R. 62-2, PageID # 113. *See also Gregory*, 444 F.3d at 750 (reversing grant of summary judgment for defendant-forensic examiner when plaintiff presented "evidence from which a jury could infer that [defendant] knew that none of Plaintiff's hair matched that found [on sexual assault victim], and thus that had this information been made known, probable cause for Plaintiff's continued detention would have dissolved"); *Mills*, 869 F.3d at 481 (reversing motion to dismiss malicious prosecution action where plaintiff sufficiently pleaded facts showing that DNA analyst's "withholding of exculpatory evidence propped up the independent determination of probable cause for Mills's ongoing detention").

Defendants' response that "[u]nlike *Mills*, the forensic testing of Jones' devices, which was inconclusive, did not contradict the undisputed facts establishing probable cause to arrest and prosecute Jones," but simply "made it more difficult to achieve a conviction," is unavailing.

Br. of Appellees at 27. This is because, "[t]he existence of an indictment is . . . not a talisman that always wards off a malicious-prosecution claim. Instead, 'even if independent evidence establishes probable cause against a suspect, it would still be unlawful for law-enforcement officers to fabricate evidence in order to strengthen the case against that suspect.'" *Mills*, 869 F.3d at 480 (citing *Webb v. United States*, 789 F.3d 647, 670 (6th Cir. 2015)). Thus, even though there was probable cause for Jones' arrest and the grand jury indictment creates a presumption of probable cause for his prosecution, the forensics test results vitiated probable cause for Jones' ongoing detention. The record is clear that Murray knew by January 11, 2014, that there was no evidence of child pornography on Jones' devices. But because there is a factual dispute as to whether Murray informed the prosecutors of these results, a genuine issue exists as to whether Murray "knowingly or recklessly" withheld this exculpatory evidence. *See Mills*, 869 F.3d at 480.

Ultimately, at the summary judgment stage, it is not for this Court or the district court to "weigh the evidence and determine the truth of the matter." *Anderson*, 106 S. Ct. at 249. There is a genuine dispute as to whether Murray falsely maintained probable cause for Jones' continued detention by not informing the prosecutors that there was no forensic evidence connecting Jones to the illegal video. Thus, a fact-finder should decide whether, "had this information been made known, probable cause for Plaintiff's continued detention would have dissolved." *Gregory*, 444 F.3d at 750; *see also, id.*, at 751 ("Because there exists a genuine issue of material fact about whether Katz intentionally withheld exculpatory information in order to continue Plaintiff's detention without probable cause, this Court reverses the district court's grant of summary judgment on this [malicious prosecution] claim.")

With respect to Plaintiff's state-law claim of malicious prosecution, Kentucky law requires the same four elements as *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010), with the addition of a fifth element: "the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice." *Martin v. O'Daniel*, 507 S.W.3d 1, 11 (Ky. 2016). "[M]alice can be inferred from [a] lack of probable cause." *Massey v. McKinley*, 690 S.W.2d 131, 134 (Ky. Ct. App. 1985); *see also*,

*Sweeney v. Howard*, 447 S.W.2d 865, 866 (Ky. Ct. App. 1969) (acknowledging "the well-recognized rule that the jury can presume malice from want of probable cause").[5]

The district court found only that because its conclusion "as to the lack-of-probable cause element also decides" the state-law claim "[t]he Court, accordingly, dismisses the state malicious prosecution claim against Perdue and Murray." R. 92, PageID # 1299. Because we reverse the district court's grant of summary judgment for Murray on the probable cause element with respect to his continued detention, we reverse on the associated state-law claim as well. And because "malice can be inferred from [a] lack of probable cause," a reasonable jury could find malice in Murray's actions if it also found that he lacked probable cause for the continued detention of Jones. *Massey*, 690 S.W.2d at 134. Thus, there is no basis under Kentucky law to affirm the district court's grant of summary judgment on Jones' state-law claim.

### 3. Summary Judgment for Defendants Perdue and Clark County, Kentucky

Jones must establish supervisory liability to hold Perdue and Clark County, Kentucky accountable for Murray's actions. A "prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor." *S.L. ex rel. K.L. v. Pierce Tp. Bd. of Trs.*, 771 F.3d 956, 963 (6th Cir. 2014) (citing *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006)). "Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Bass v. Robinson,* 167 F.3d 1041, 1048 (6th Cir. 1999) (citing *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1246 (1989)). Rather, the supervisors must have actively engaged in unconstitutional behavior. *Gregory*, 444 F.3d at 751 (citing *Bass*, 167 F.3d at 1048). "Therefore, liability must lie upon more than a mere right to control employees and cannot rely on simple negligence." *Id.* "A supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cty.*, 668 F.2d 869, 874 (6th Cir. 1982)). In *Gregory*, the plaintiff showed only that the supervisors had failed

---

[5]Jones did not oppose the district court's dismissal of his state-law claim against Clark County because, as the district court observed, "sovereign immunity acts a shield." R. 92, PageID # 1299. The state-law claim is therefore only being appealed as it applies to Murray and Perdue.

to review the work of their subordinates. 444 F.3d at 751. Thus, while this Court found "a genuine issue of material fact about whether [defendant officer] intentionally withheld exculpatory information in order to continue Plaintiff's detention without probable cause," the district court's grant of summary judgment with respect to the officer's supervisors was affirmed. *Id.* "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Hays*, 668 F.2d at 874.

Similarly, a county may not be sued under § 1983 solely because an injury was inflicted by one of its employees or agents. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Instead, "a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom." *Id.* (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)).[6] Such a policy can be shown via "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Id.* Additionally, "[t]o succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

In *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), the Supreme Court held that when a plaintiff alleges that an unconstitutional municipal policy is evinced by a single decision by a municipal official, "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability" and that state law determines whether a municipal official has "final policymaking authority." *Id.* at 123. This Court has distinguished "between 'policymaking' authority, which entails a certain amount of discretion to choose

---

[6]*Monell* includes a longer list of conduct for which municipalities may be sued under § 1983: "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. Because of "[t]he length of this list of types of municipal action," we use the "shorthand term 'policy or custom,' but when we do so, we mean to refer to the entire list." *Los Angeles Cty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010).

among various plausible alternatives, and 'factfinding' authority, which involves assessing the fixed realities of a situation" and held as a result that a coroner's authority to make factual findings regarding a person's cause of death was not policy-making. *Jorg v. City of Cincinnati*, 145 F. App'x 143, 147 (6th Cir. 2005).

Jones has established a genuine issue as to the "prerequisite . . . unconstitutional conduct" by a subordinate—Murray—to support a claim of supervisory liability against Sheriff Perdue. *S.L. ex rel. K.L.*, 771 F.3d at 963. However, no genuine dispute of material fact remains over whether Perdue, through municipal policy, custom or official action, acted unconstitutionally. Jones has not set forth any facts indicating that Perdue authorized or participated in Murray's arguably unlawful conduct. As in *Gregory*, the record, at the most, indicates that Perdue failed to review Murray's work, not that Perdue lacked "a reasonable system" to review subordinates work generally. 444 F.3d at 751.

Similarly, Plaintiff has failed to demonstrate a genuine dispute as to any material fact regarding Clark County's liability in this matter. On appeal, Jones argues only that "a county can be liable under 42 U.S.C. §1983 when it tolerates a custom or practice which causes a constitutional violation" and that "Murray's power was so absolute, and he was given such free rein over the lives and liberty of people like Jones, that his acts and omissions could fairly be characterized as those of a person to whom the County and its Sheriff had delegated final decision-making authority, and for which they can be properly held liable." Br. of Appellant at 46–47.

His first argument fails because Jones has failed to allege the existence of a "custom or practice" in Clark County that would warrant a claim of supervisory liability in this suit. He vaguely references "the lives and liberty of people like Jones," but his brief provides no further argument or evidence of repeated violations akin to the one against Jones—be they malicious prosecutions generally or those involving child pornography. Even looking at the facts in the light most favorable to Jones, there is nothing in the record or raised in his brief that defeats summary judgment for the County.

His second argument, that the County vested Murray with the authority to make municipal policy, fails because Jones has not demonstrated with any argument or facts present in the record that state or local law vested Murray with the authority to make county policy. Arguably Perdue granted Murray significant discretion in his investigations, but that cannot be considered "policy" for the purposes of § 1983. There is no evidence that Murray attempted to institutionalize any of his allegedly unconstitutional actions as policy or undertook them in conformity with a pre-existing policy. Like the coroner in *Jorg*, Murray was "assessing the fixed realities of a situation" and finding facts in the course of his police work, not setting policy. 145 F. App'x at 147. As such, liability for the County cannot attach.

Jones' argument that Murray lacked sufficient training to investigate internet crimes such that Perdue and Clark County "can reasonably be said to have been deliberately indifferent to the need" for greater training fails as well. Br. of Appellant at 45–46 (citing *City of Canton*, 489 U.S. at 390). Jones simply asserts that a lack of training made it likely enough for a constitutional violation to occur that the supervisory Defendants can be held liable. *Id.* But he does not identify any evidence regarding Murray's training. And the record shows that Murray had at least been trained on the fact that an IP address could be hacked.

### 4. The Remaining *Sykes* Factors

The district court expressly granted summary judgment for Defendants because it found Jones failed to establish that the government lacked probable cause for its prosecution of him. However, we now address the other factors required by *Sykes* to make out a malicious prosecution claim and explain why they do not present alternative grounds for affirming the district court.[7] Defendants do not seriously contest that Murray's actions fulfilled the first element: that the plaintiff must show that the defendant made, influenced, or participated in the decision to prosecute him. This is unsurprising inasmuch as Murray clearly influenced and participated in the proceedings against Jones by arresting him and collaborating with prosecutors

---

[7]Specifically, the district court stated that it "elects to process the summary judgment motion without analyzing Defendants' element 1 arguments." R. 92, PageID # 1287 n.5. It further noted that its decision was based on a finding that "*Sykes* element 2 disposes of the federal claim." *Id.* The district court opinion then engaged in a lengthy discussion of the fourth *Sykes* element, but qualified its comments in stating that it "does not issue a decision on this basis but notes its concern over the claim element." *Id.* at PageID # 1297.

to build the case against him.  It was Murray's arrest report of Jones and grand jury testimony that formed the core of the prosecution's case.  *See, e.g.*, *Arnold v. Wilder*, 657 F.3d 353, 366 (6th Cir. 2011) (holding that the first element was satisfied when an officer "did not have to arrest" the plaintiff but "insisted on doing so" and because "the charges were initiated at the instance of the officer by his making an arrest and filling out a uniform citation").  The third element—requiring the plaintiff to demonstrate that the legal proceedings caused a deprivation of liberty—was not disputed by either party, nor mentioned in the district court order.  Because Jones spent some fourteen months imprisoned as a result of Defendants' actions, we find that this element is easily satisfied.

The fourth element required by *Sykes*—that the criminal proceeding was resolved in favor of the plaintiff—presents a closer question.  This Court has not addressed the narrow issue presented in this case: whether a dismissal without prejudice constitutes a favorable termination for the purposes of a malicious prosecution action.  However, the district court and Defendants in the present case appear to have ignored our decision in *Ohnemus v. Thompson*, which, while unpublished, most directly speaks to this question.  594 F. App'x 864 (6th Cir. 2014).  In *Ohnemus*, we stated that, "[t]he termination [of proceedings] must go to the merits of the accused's professed innocence for the dismissal to be 'favorable' to him."  *Id.* at 867 (citing *Alcorn v. Gordon,* 762 S.W.2d 809, 812 (Ky. Ct. App. 1988)).  And "[o]nly where dismissal indicates that the accused may be innocent of the charges, have Kentucky courts found that the termination of the proceedings were favorable to the party bringing a malicious prosecution claim."  *Id*.  We held that the proceedings against the plaintiff did not terminate in his favor because he paid restitution in exchange for a dismissal of the theft charge brought against him. *Id.* at 868; *see also*, *id.* at 867 ("In order for a termination of proceedings to be favorable to the accused, the dismissal must be one-sided and not the result of any settlement or compromise.").

Instead of addressing this case law, Defendants and the district court relied on decisions from a few district courts in this circuit that have found that a dismissal without prejudice is not a favorable termination.  Such decisions do not bind us.  Each decision, moreover, is inapposite. *See e.g.*, *Mobley v. City of Detroit*, 938 F. Supp. 2d 669, 687 (E.D. Mich. 2012) (relying on a mistaken citation to an unpublished decision, *Cheolas v. City of Harper Woods*, 467 F. App'x

374 (6th Cir. 2012));[8] *Thornton v. City of Columbus*, 171 F. Supp. 3d 702, 710 (S.D. Ohio 2016) (involving dismissal following a hung jury).

*Ohnemus* and the state law cases it cites rely on the Restatement (Second) of Torts which clearly supports finding that the proceedings against Jones terminated in his favor. Commentary to the Restatement provision on the termination of proceedings that give rise to private malicious prosecution actions provides in relevant part that "[t]he abandonment of the proceedings because the accuser believes that the accused is innocent or that a conviction has, in the natural course of events, become impossible or improbable, is a sufficient termination in favor [of] the accused." Restatement (Second) of Torts § 660 cmt. d (Am. Law Inst. 1977); *see also*, *Heck v. Humphrey*, 512 U.S. 477, 484–86 (1994) (applying principles governing the tort of malicious prosecution to explain why § 1983 malicious prosecution claims must also include a demonstration that the prior criminal proceeding terminated in favor of the accused); *Hoskins v. Knox Cty.*, No. 17-84-DLB-HAI, 2018 WL 1352163, at *9 (E.D. Ky. Mar. 15, 2018) (observing that this Court has looked to the Restatement (Second) of Torts "for guidance on whether a proceeding was terminated in the accused's favor" and finding a dismissal without prejudice could meet this standard if it indicates the innocence of the accused).

We have good reason independent of state or tort law principles to find that a showing that the government abandoned the prosecution because acquittal became "improbable" is enough to meet this element of § 1983 malicious prosecution actions. The fact that the government recognized its error and moved to dismiss charges before a trial could be conducted or completed should not bar a subsequent malicious prosecution claim. A contrary holding would punish would-be plaintiffs for having a weak case brought against them. The Supreme Court made clear in *Heck* that the purpose of the favorable termination element is to prevent a collateral attack by a "convicted criminal defendant" on the conviction itself. 512 U.S. at 484. That logic is inapplicable to a case such as this, where there is no conviction and the malicious prosecution claim itself is founded on the dearth of evidence substantiating the institution and

---

[8]In *Cheolas*, the fact that charges against one of the plaintiffs were "voluntarily dismissed" was only relevant to our finding that the plaintiff could not demonstrate that he suffered a deprivation of liberty as a result of the alleged malicious prosecution (*i.e.*, the second *Sykes* element), not whether the proceedings terminated in his favor. 467 F. App'x at 378.

continuation of proceedings in the first place.  Categorically construing the favorable termination requirement to exclude plaintiffs whose cases were dismissed without prejudice would undermine the ability of malicious prosecution claims to hold officials accountable for baseless legal proceedings simply because those proceedings ended prior to a verdict.  This would weaken the protections and deterrence provided by § 1983 and effectively deny an entire class of plaintiffs a remedy for their constitutional violations.

That said, Jones must still demonstrate that his "dismissal indicates that [he] may be innocent of the charges," *Ohnemus*, 594 F. App'x at 867, or that a conviction has become "improbable," Restatement (Second) of Torts § 660. And "the determination of whether a termination is sufficiently favorable ultimately rests with the trial court as a matter of law, absent a factual dispute relative to the circumstances of the dismissal." *Ohnemus*, 594 F. App'x at 866 (citing *Davidson v. Castner-Knott Dry Goods Co., Inc.,* 202 S.W.3d 597, 606 (Ky. Ct. App. 2006)).

Taking the evidence in the light most favorable to Jones, he has established a sufficient factual dispute to overcome summary judgment.  Prosecutors Engel and Johnson testified that they moved to dismiss the charges against Jones because they had no evidence connecting him to the illegal video.  Johnson specifically noted that Lars Daniel's report indicating that there was no evidence of an Ares download on Jones' devices meant he could no longer impeach Jones' credibility insofar as Jones consistently denied downloading the illegal video, possessing the video, or even using the Ares peer-to-peer file sharing network.  These statements suggest, at a minimum, that there is a genuine dispute as to whether the prosecutors' decision to voluntarily dismiss the charges against Jones was indicative of his innocence or show that his conviction was improbable. *See also*, Restatement (Second) of Torts § 659 cmt. e (Am. Law. Inst. 1977) (noting that favorable termination can be established via "formal abandonment of criminal proceedings" as evidenced by "a motion to dismiss the complaint").  Moreover, no new charges have been brought against Jones and no additional evidence has been discovered.  These facts only reinforce this Court's conclusion that Jones has met his burden, at the summary judgment stage, to show a genuine issue as to whether the proceedings against him terminated in his favor.

**B. Qualified Immunity for Defendants**

**1. Standard of Review**

This Court reviews a grant of summary judgment on the basis of qualified immunity *de novo*. *Flint ex rel. Flint v. Ky. Dept. of Corr.*, 270 F.3d 340, 346 (6th Cir. 2001) ("Qualified immunity is a question of law also to be reviewed *de novo* by this Court."). And courts "should not grant summary judgment on the issue of qualified immunity if there exists a genuine issue of material fact, 'involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.'" *Id.* (quoting *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988)). A defendant is only entitled to summary judgment "if discovery fails to uncover evidence sufficient to create a genuine issue as to the truth of the allegations that the defendant in fact committed acts that violate clearly established law." *Poe*, 853 F.2d at 425.

**2. Analysis**

The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Court further held that judges on summary judgment motions "may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Id.* Unless the law was clearly established at the time the action occurred, the government official will receive qualified immunity and be insulated from civil suit. *Id.* This Court has made it clear that once a defendant has raised a qualified immunity defense, the plaintiff bears the burden of showing that the defendant is not entitled to it. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015); *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012).

On summary judgment, the judicial analysis into whether the defendant is entitled to qualified immunity consists of a "two-tiered inquiry." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). The first tier asks whether "taken in the light most favorable to the party asserting the injury, [] the facts alleged show that the officer's conduct violated a

constitutional right." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). The second tier queries whether the right is clearly established. *Id; see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that district courts and courts of appeal can address the questions in either order). The Supreme Court has held that it does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The standards articulated by this Court in *Silberstein* and *Poe* effectively dispose of the first inquiry. The foregoing discussion of Jones' continued detention illustrates that a genuine issue of material fact exists as to whether Murray violated Jones' constitutional right "to be free from malicious prosecution by a defendant who has made, influenced, or participated in the decision to prosecute the plaintiff." *King*, 852 F.3d at 582–83. If there was no probable cause for Jones' continued detention and Murray withheld the forensics test results from the prosecutors, then Murray did violate Jones' constitutional rights.

The greater challenge is the second inquiry: whether the right was "clearly established" at the time of the alleged violation. The right must be "so clearly established in a particularized sense that a reasonable officer confronted with the same situation would have known that his conduct violated that right." *Moseley*, 790 F.3d at 653. A court is to "zoom in close enough to ensure the right is appropriately defined" to reach a "concrete, particularized description of the right." *Martin*, 712 F.3d at 960 (quoting *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012)). "If it defeats the qualified-immunity analysis to define the right too broadly . . . it defeats the purpose of § 1983 to define the right too narrowly." *Hagans*, 695 F.3d at 508–09. And the Supreme Court has said that "[a] rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 138 S. Ct. at 590 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

This Court has repeatedly held that "individuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has made, influenced, or participated in the decision to prosecute the plaintiff." *King*, 852 F.3d at 582–83. The right includes malicious prosecutions in which an officer participates by "knowingly or

recklessly making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants." *Id.* at 583. This Court has also held that "[f]reedom from malicious prosecution is a clearly established Fourth Amendment right." *Webb*, 789 F.3d at 659; *see also Thacker v. City of Columbus*, 328 F.3d 244, 258 (6th Cir. 2003) (holding that this Court recognizes "a federal claim of malicious prosecution under the Fourth Amendment where plaintiffs alleged that defendants wrongfully investigated, prosecuted, convicted, and incarcerated them").

This Court first acknowledged this right to be a "clearly established" Fourth Amendment right in *Spurlock*. 167 F.3d at 1006. This Court held that "malicious prosecution of an individual and continued detention of an individual without probable cause clearly violate[s] rights afforded by the Fourth Amendment." *Id.* (citing *Albright v. Oliver*, 510 U.S. 266, 274 (1994)). This Court's holding in *Spurlock* relied, in part, on its observation that "a reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." *Id.*

In the present case, Defendants argue that:

> The law was not clear in 2013 (and still is not clear) that probable cause to prosecute a suspect on a child pornography charge requires forensic evidence of child pornography or that the identification of the subscriber for an IP address used to download child pornography coupled with other undisputed facts Deputy Murray learned is insufficient to establish probable cause for prosecution.

Br. of Appellees at 29.

Defendants do not demonstrate why their formulation of the requisite "clearly established law" is appropriate. There is an undoubted right "to be free from malicious prosecution by a defendant who has made, influenced, or participated in the decision to prosecute the plaintiff." *King*, 852 F.3d at 582–83. This right applies in cases where the officer has falsified statements or withheld evidence and facilitated the continued detention of a plaintiff without probable cause. That is the right Jones argues was violated. And this has been the law since at least 1999, when *Spurlock* was decided. 167 F.3d at 1005–06.

In *King*, this Court recently used this formulation of the right in reversing a district court's grant of summary judgment to a police officer (Harwood) accused of malicious prosecution by King. 852 F.3d at 582–84. We discussed aspects of Harwood's investigation that, when all reasonable inferences were drawn in King's favor, raised multiple issues of material fact. *Id.* (discussing, for example, how Harwood "knew that King's gun was not the murder weapon" and that Harwood knew that the bullet holes in King's floor were not caused by the bullets that killed the victim King was accused of killing). We recognized that there was clearly established law prohibiting malicious prosecutions. *Id.* at 582–83. The specifics of the case only mattered with respect to assessing the viability of the malicious prosecution claim under the standard for summary judgment, not as a means of narrowly defining the right at issue. This Court reached a similar conclusion in *Spurlock*:

> We conclude that, here, plaintiffs sufficiently raised claims that allege violations of their constitutional and/or statutory rights. Namely, that Satterfield and other defendants wrongfully investigated, prosecuted, convicted and incarcerated them; that Satterfield fabricated evidence and manufactured probable cause; that they were held in custody, despite a lack of probable cause to do so; and that Satterfield and others conspired to maliciously prosecute and convict them.

167 F.3d at 1005. Again, this Court defined the right as one against malicious prosecution (*i.e.*, prosecution and continued detention without probable cause). And in *Gregory* we found that "[t]he *Spurlock* panel held that the right to be free of continued detention without probable cause was clearly established well before the 1993 events in question in the case at bar." 444 F.3d at 749–50. We also observed that *Spurlock* affirmed the duty of investigating officials "to refrain from engaging in acts which continue[] a person's detention without probable cause." *Id.* at 749.

In the present case, Jones contends that Murray violated his right against malicious prosecution by facilitating Jones' unlawful continued detention after the forensics results produced no evidence that Jones' devices contained child pornography. A reasonable jury could find that probable cause for Jones' continued detention dissolved after the forensics test was completed and that rather than tell the prosecutors about this critical development in the case Murray withheld that information and thereby continued Jones' detention. If a jury makes both determinations, then Murray would be liable for malicious prosecution of Jones. Such behavior is similar enough to the defendant officers and officials in cases like *Gregory* and *Mills* for

Murray to "have known that his conduct violated [Jones'] right," *Moseley*, 790 F.3d at 65, and for us to conclude that the unlawfulness of Jones' detainment after Murray received the forensic examination results "follow[s] immediately from" the well-established right to be free from continued detention without probable cause. *Wesby*, 138 S. Ct. at 590.

### III. CONCLUSION

For these reasons, we **REVERSE IN PART** and **AFFIRM IN PART** the district court's order. We **REVERSE** the portion of the order granting summary judgment for Defendant Murray on Plaintiff's federal and state malicious prosecution claims, as well as the grant of qualified immunity to Defendant Murray, but **AFFIRM** the district court's order granting summary judgment for Defendants Perdue and Clark County, Kentucky. We **REMAND** the case to the district court for trial.

_____

**CONCURRING IN PART AND DISSENTING IN PART**

_____

MURPHY, J., concurring in part and dissenting in part. David Jones brought a "malicious-prosecution" claim under the Fourth Amendment against Clark County Sheriff's Deputy Lee Murray and subsidiary claims against Sheriff Berl Perdue and Clark County. I agree with and concur in much of the majority opinion. I concur in the holding (in Part II.A.2.i) that Murray had probable cause to arrest Jones in October 2013 when the police traced child pornography to the IP address at his apartment. I also concur in the holding (in Part II.A.3) that Jones cannot establish supervisory liability against Perdue or municipal liability against Clark County. But I must respectfully part ways with the majority's view that Jones may proceed with his claim that Murray lacked probable cause for Jones's "continued detention" after January 2014 when Murray received the results of a forensic examination of Jones's cellphone and tablet computer. I would affirm the denial of Jones's continued-detention claim on qualified-immunity grounds.

My reason is simple: The majority notes that Jones has a clearly established right to be free from a malicious prosecution. But the Supreme "Court has repeatedly told courts . . . not to define clearly established law at a high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)); *see, e.g.*, *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018); *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *City and Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam); *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). The lack of probable cause that Jones alleges in this case "does not follow immediately from the conclusion" that he has a clearly established legal right to be free from a malicious prosecution. *Wesby*, 138 S. Ct. at 590 (citation omitted). The majority thus defines the legal rule too generally and Murray is entitled to qualified immunity.

I

In my view, two undisputed principles compel us to rule for Murray on Jones's Fourth Amendment challenge to his continued detention after Murray received the forensic-examination results from the Lexington Metro Police Department in January 2014. The first: No matter how Jones styles his Fourth Amendment "malicious-prosecution" claim, it fails if Murray at all times had probable cause to believe that Jones committed the child-pornography offense. *See Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017); *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010); *cf. Nieves v. Bartlett*, 139 S. Ct. 1715, 1726–27 (2019). The second: Qualified immunity requires Jones to show that "the unlawfulness of [Murray's] conduct was 'clearly established at the time'" Murray acted. *Wesby*, 138 S. Ct. at 589 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Under these rules, I would grant Murray qualified immunity because an objective police officer could reasonably conclude that probable cause continued to exist even after receiving the forensic-examination results.

A

The Supreme Court has imposed doubly demanding standards on plaintiffs who seek to hold police officers liable under 42 U.S.C. § 1983 for "seizing" them without "probable cause" in violation of the Fourth Amendment. Plaintiffs must show not just that the officers failed to meet the minimal threshold required for probable cause, but also that the officers were plainly incompetent in concluding that they had met it.

Start with probable cause. "Probable cause," the Supreme Court has "often" reminded, "is not a high bar." *Wesby*, 138 S. Ct. at 586; *Kaley v. United States*, 571 U.S. 320, 338 (2014). As Chief Justice Marshall long ago explained, the phrase "means less than evidence which would justify condemnation" and so does not compel the police to develop the type of evidence needed for a criminal conviction after a jury trial. *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (quoting *Locke v. United States*, 11 U.S. 339, 348 (1813)). Instead, this probability standard requires only "a reasonable ground for belief of guilt," one that is "particularized with respect to" the person the police seek to detain. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citations omitted). Put differently, the Court requires only "the kind of 'fair probability' on which

'reasonable and prudent [people,] not legal technicians, act.'" *Florida v. Harris*, 568 U.S. 237, 244 (2013) (quoting *Gates*, 462 U.S. at 238); *see also Carroll v. United States*, 267 U.S. 132, 161–62 (1925).

The Court has given us two procedural instructions for applying this standard. The first teaches that the probable-cause inquiry follows a "totality-of-the-circumstances analysis" considering everything known to a police officer in a given case. *Gates*, 462 U.S. at 238; *see Ornelas v. United States*, 517 U.S. 690, 696 (1996). This "flexible, all-things-considered approach" rejects "rigid rules, bright-line tests, and mechanistic inquiries[.]" *Harris*, 568 U.S. at 244. The second instruction teaches that the probable-cause determination follows "an objective standard." *Wesby*, 138 S. Ct. at 584 n.2. The "[s]ubjective intentions" of the police officers who make a seizure "play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996).

This probable-cause standard applies to all "seizures" up to the jury trial. *See Manuel v. City of Joliet*, 137 S. Ct. 911, 920 n.8 (2017). So when deciding whether police officers correctly found that they had probable cause to make the initial arrest, courts examine the totality of "events leading up to the arrest" and view the record "from the standpoint of an objectively reasonable police officer." *Pringle*, 540 U.S. at 371 (citation omitted). The same standard applies when different state actors (a grand jury for an indictment or a magistrate for a probable-cause hearing) decide whether the evidence permits an extended period of pretrial detention. *Gerstein v. Pugh*, 420 U.S. 103, 120 & n.21 (1975); *see Kaley*, 571 U.S. at 328–30.

Now turn to qualified immunity. This doctrine "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks and citation omitted). To overcome the defense, a plaintiff must show that "the violative nature of *particular conduct* [was] *clearly established*" when a police officer engaged in that conduct. *al-Kidd*, 563 U.S. at 742 (emphases added). These two phrases—"clearly established" and "particular conduct"—give this test its teeth.

To be "clearly established," a legal rule must be "sufficiently clear that every reasonable official would have understood that what he is doing violates" the rule. *Mullenix*, 136 S. Ct. at 309 (quoting *Reichle*, 132 S. Ct. at 2093). This standard does not "require a case directly on point" matching the officer's conduct fact for fact. *al-Kidd*, 563 U.S. at 741. Still, "[i]t is not enough that the rule is suggested by then-existing precedent." *Wesby*, 138 S. Ct. at 590. "[E]xisting precedent must have placed the . . . constitutional question beyond debate," *al-Kidd*, 563 U.S. at 741, so that a court may call the rule "settled law," *Wesby*, 138 S. Ct. at 589 (citation omitted).

Critically, this inquiry also "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (citation omitted). Courts should not "define clearly established law at a high level of generality," *al-Kidd*, 563 U.S. at 742, because "doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced," *Plumhoff*, 572 U.S. at 779. A plaintiff instead must define the clearly established rule with "a high 'degree of specificity.'" *Wesby*, 138 S. Ct. at 590 (citation omitted). How much specificity? "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Id.* (citation omitted). The Supreme Court, for example, has long held that an officer may not use "excessive force." *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989). But articulating the rule at this high level of generality will almost never clearly answer whether an officer's particular use of force was "excessive." *Kisela*, 138 S. Ct. at 1153.

"[S]pecificity is especially important in the Fourth Amendment context" because courts often use totality-of-the-circumstances tests to implement this amendment. *Mullenix*, 136 S. Ct. at 308. Probable cause proves the point. "Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in 'the precise situation encountered.'" *Wesby*, 138 S. Ct. at 590 (citation omitted). So "a body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause." *Id.* (internal quotation marks and citation omitted). And the Court has "stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" *Id.* (citation omitted). Whether right or wrong, *compare* Aaron L. Nielson

& Christopher J. Walker, *A Qualified Defense of Qualified Immunity*, 93 Notre Dame L. Rev. 1853 (2018), *with* William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018), "[t]his demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law,'" *Wesby*, 138 S. Ct. at 589 (citation omitted).

B

Applying this law here, I would find Murray entitled to qualified immunity on the probable-cause element of Jones's continued-detention claim under the Fourth Amendment. The "body of relevant caselaw" in this child-pornography context supports Murray more than Jones. *Id.* at 591 (citation omitted). That caselaw affirmatively shows the *presence* of probable cause when Murray arrested Jones in October 2013, and it does not clearly establish the *absence* of probable cause when Murray received the forensic-examination results in January 2014. Under the Supreme Court's precedent, then, Jones cannot overcome Murray's qualified-immunity defense.

*Time of Arrest.* Like the majority, I agree that probable cause existed at the time of Jones's arrest. And I am comfortable resolving this constitutional question before the qualified-immunity question because, under the great weight of precedent, it is "apparent that in fact the relevant facts do not make out a constitutional violation at all." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Consider the facts that Murray knew when he first detained Jones in October 2013—facts that are also relevant to whether probable cause later dissolved. According to the affidavit to search Jones's apartment, Murray knew that an electronic device associated with a specific IP address had made available through the "Ares P2P file sharing network" "at least 21" files that the police found "of investigative interest" because their hash values matched the hash values of known child pornography. A detective with the Lexington Metro Police Department had downloaded one of those files on October 11 and confirmed that it did, in fact, contain a video of an adult man attempting to have sex with a prepubescent girl. In response to a warrant for subscriber information, AT&T informed Murray that the IP address associated with this child pornography belonged to Jones at his apartment. After obtaining a search warrant on October

26, Murray and other deputies then searched Jones's apartment and saw no one else there. At that point Jones became the primary suspect for the child pornography accessible from his IP address. During later questioning at the sheriff's office on the same day, Murray also learned that Jones's internet router (from which other devices could connect to the internet through his IP address) was password protected. Murray learned that Jones never shared his password or devices with anyone. And he learned that Jones had been home alone at the time of the October 11 download.

The child pornography associated with Jones's IP address was enough to give an objective officer "a reasonable ground" to believe that Jones had committed the charged Kentucky child-pornography offense. *Pringle*, 540 U.S. at 371 (citation omitted); *see* Ky. Rev. Stat. 531.320(1). Indeed, courts have overwhelmingly held that probable cause exists to search a residence (and the electronic devices found there) when police have evidence connecting a home's IP address to child pornography. *See United States v. Gillman*, 432 F. App'x 513, 515 (6th Cir. 2011); *United States v. Hinojosa*, 606 F.3d 875, 885 (6th Cir. 2010); *see also United States v. Bosyk*, 933 F.3d 319, 325–26 (4th Cir. 2019); *United States v. Featherly*, 846 F.3d 237, 240 (7th Cir. 2017) (per curiam); *United States v. McLellan*, 792 F.3d 200, 211 n.9 (1st Cir. 2015); *United States v. Renigar*, 613 F.3d 990, 994 (10th Cir. 2010); *United States v. Vosburgh*, 602 F.3d 512, 526–27 (3d Cir. 2010); *United States v. Perez*, 484 F.3d 735, 740 (5th Cir. 2007).

To be sure, the "focus" of probable cause to arrest (whether the defendant committed a crime) is "different" from the "focus" of probable cause to search (whether a location contains evidence of a crime). *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996). But "the prudent person standard is the same" in both contexts. *Id.* So "[i]t is generally assumed by the Supreme Court and the lower courts that the same quantum of evidence is required whether one is concerned with probable cause to arrest or probable cause to search." 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.1(b), Westlaw (database updated Oct. 2019). Here, the fact that the IP address belonged to Jones and that he appeared to be the only one who lived in the apartment provided enough evidence "particularized with respect to" him to justify a reasonable belief that he was the one who had committed this child-pornography offense. *Pringle*, 540 U.S. at 371; *cf. Greene*, 80 F.3d at 1106.

In response, Jones makes much of the fact that internet routers can be hacked, allowing others to use an IP address for illicit purposes without the owner's knowledge. That may have been a good defense at trial. But probable cause does not compel the police to present a prima facie case that Jones committed the crime. *Gates*, 462 U.S. at 235. It requires only a "fair probability" that he did so. *Harris*, 568 U.S. at 244 (citation omitted). And the possibility of an innocent explanation for the connection between Jones's IP address and child pornography does not eliminate a reasonable belief that he committed the offense. Indeed, the Lexington detective who downloaded the file from Jones's IP address (and who specializes in child-pornography cases) testified that, in his six years in this line of work, he has never seen a case where someone hacked into someone else's password-protected router to download or share child pornography. Unsurprisingly, courts have uniformly rejected this sort of probable-cause argument. *Gillman*, 432 F. App'x at 515; *see Featherly*, 846 F.3d at 240; *Vosburgh*, 602 F.3d at 527; *Perez*, 484 F.3d at 740.

*Time of Forensic-Evidence Results*. Did things change on January 11, 2014, when Murray received the results of the Lexington Metro Police Department's forensic examination of Jones's cellphone and tablet computer? Under our caselaw governing a "continued detention without probable cause," Jones must prove that the forensic-examination results "dissolved" the probable cause that initially supported Murray's arrest (and the indictment in December 2013). *See Gregory v. City of Louisville*, 444 F.3d 725, 747, 750 (6th Cir. 2006). I do not think the results did so when assessed through the lens of the demanding qualified-immunity framework. And I do not see a need to say anything more about this closer constitutional question on the merits, both because the constitutional question is "factbound" and because courts regularly provide probable-cause guidance in criminal cases with no qualified-immunity defense. *See Pearson*, 555 U.S. at 237, 242; *cf.* Nielson & Walker, *supra*, 93 Notre Dame L. Rev. at 1884.

The probable-cause test remains the same throughout a case's pretrial proceedings. *See Manuel*, 137 S. Ct. at 920 n.8; *Gerstein*, 420 U.S. at 120 & n.21. So we must again take the perspective of an "objectively reasonable police officer," *Pringle*, 540 U.S. at 371, and consider the "totality" of the new (and old) evidence, *Gates*, 462 U.S. at 238. In that respect, the results of the new evidence were mixed. True, the forensic examination of Jones's first device

(a smartphone) did not turn up child pornography. This fact would make it more difficult to prove beyond a reasonable doubt that Jones had committed the child-pornography offense. But other evidence that the examination uncovered made it more likely that Jones had committed the crime. Most notably, the results showed that Jones had previously used the Ares file-sharing program. Forensic testers found a partial audio file on Jones's phone that had been downloaded through this Ares program and later deleted. As Murray testified, the Ares file-sharing program was "frequently used by child pornographers." And that Ares program was the one used when the Lexington detective downloaded child pornography from a device connected to Jones's IP address. Not only that, Jones had denied ever using Ares, so a reasonable officer could think this evidence caught him in a lie. *Wesby*, 138 S. Ct. at 587–88.

In addition, the forensic examination did not exclude the possibility that Jones's devices contained child pornography. The Lexington police could not test Jones's second device, a month-or-two-old tablet computer, because it was "too new." As the prosecutor later testified, technology might advance to the point where law enforcement could later test that tablet. Law enforcement also did not seize Jones's devices until two weeks after he allegedly made the child pornography available for download, so Jones may have deleted the offending files. Murray also knew that forensic testing is "[n]ot a hundred percent" effective at recovering deleted files. Jones's expert confirmed this: He found nearly 120,000 deleted files on Jones's phone that had been either images or still frames of videos, but many of these files appeared as indecipherable "gray blocks."

When considering all the facts collectively and objectively, an officer would not have been "plainly incompetent" in believing that probable cause still existed. *Wesby*, 138 S. Ct. at 589 (citation omitted). "Tellingly," Jones does not cite "a single precedent—much less a controlling case or robust consensus of cases—finding [the absence of probable cause] 'under similar circumstances'": when police connect child pornography to a residence's IP address but fail to uncover child pornography on electronic devices at the residence. *Id.* at 591 (quoting *White*, 137 S. Ct. at 552). Yet in this probable-cause context the Supreme Court has stressed "the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" *Id.* (citation omitted).

And what is the "clearly established" legal rule that would have given Murray unambiguous notice that probable cause no longer existed after January 2014? *See Mullenix*, 136 S. Ct. at 308.  I do not think it can be the general "right under the Fourth Amendment to be free from continued detention without probable cause." *Gregory*, 444 F.3d at 750.  That right is far "too general" because the "unlawfulness of [Murray's] conduct 'does not follow immediately from the conclusion that'" it is clearly established.  *Wesby*, 138 S. Ct. at 590 (citation omitted).  In sum, Jones's continued-detention claim must fail because he has not proved that Murray's conduct "violate[d] clearly established . . . constitutional rights of which a reasonable person would have known." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted).

C

Neither Jones nor the majority opinion identifies a clearly established legal rule that would have put Murray on notice that he lacked probable cause after receiving the forensic-examination results.  Jones does not even attempt to meet this "demanding standard." *Wesby*, 138 S. Ct. at 589.  His 47-page brief devotes a single sentence to qualified immunity, asserting that because Murray "failed to show that [Murray] did not violate Jones' constitutional rights, [Murray] is not entitled to qualified immunity." Apt. Br. 47.  This will not do.  To rebut qualified immunity, Jones must prove that Murray violated a constitutional right *and* that this right was clearly established. *Wesby*, 138 S. Ct. at 589.  Jones both flips the burden of proof and collapses the two inquiries, leaving no separate work for qualified immunity apart from the underlying constitutional question.

With respect, the majority largely does the same by defining the "clearly established" law at a high level of generality.  It correctly notes that our cases establish "an undoubted right 'to be free from malicious prosecution by a defendant who has made, influenced, or participated in the decision to prosecute the plaintiff'" and that "[t]his right applies in cases where the officer has falsified statements or withheld evidence and facilitated the continued detention of a plaintiff without probable cause." Maj. Op. 23 (quoting *King v. Harwood*, 852 F.3d 568, 582–83 (6th Cir. 2017)).  But the qualified-immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted).  The Supreme Court has emphatically made this point in recent years,

repeatedly telling courts "'not to define clearly established law at a high level of generality.'" *Emmons*, 139 S. Ct. at 503–04 (quoting *Kisela*, 138 S. Ct. at 1153). I do not believe the majority identifies its legal rule with the "high 'degree of specificity'" that the Supreme Court's cases demand. *Wesby*, 138 S. Ct. at 590 (quoting *Mullenix*, 136 S. Ct. at 309). Its proposed legal rule is analogous to suggesting that there is a clearly established right to be free from "excessive force"—a level of generality that the Supreme Court has repeatedly rejected. *See, e.g.*, *Emmons*, 139 S. Ct. at 503.

I concede that the Supreme Court does not require a case directly on point and that courts may face difficulty identifying the "correct" level of generality at which to articulate a legal rule. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017). But the Court has recognized these concerns too. It has given us a benchmark to decide whether a rule is too general: Does "the unlawfulness of the officer's conduct" "follow *immediately* from the conclusion" that the proposed rule is clearly established? *Wesby*, 138 S. Ct. at 590 (emphasis added; citation omitted). If not, the rule "is too general." *Id.* Apply this question to the majority's proposed rule: Does the lack of probable cause to detain Jones after the forensic-examination results "follow immediately from" the rule that plaintiffs have a right to be free from a continued detention without probable cause? *Id.* Not at all. "Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in 'the precise situation encountered.'" *Id.* (citation omitted). In this probable-cause context, I would think Jones should have identified a "body of relevant case law" setting forth more specific rules over when evidence tying a defendant's IP address to child pornography does not create probable cause. *Id.* (citation omitted). But Jones identifies no such caselaw. The reason is obvious: the caselaw supports the conclusion that probable cause existed here. *See, e.g.*, *Gillman*, 432 F. App'x at 515.

Jones instead relies on our cases allowing malicious-prosecution claims to proceed based on continued-detention theories. *See Mills*, 869 F.3d at 481; *Gregory*, 444 F.3d at 750. But these factually far-afield cases did not involve "an officer acting under similar circumstances[.]" *Wesby*, 138 S. Ct. at 590 (quoting *Pauly*, 137 S. Ct. at 552). *Gregory* and *Mills* both involved § 1983 plaintiffs who had been convicted of rape and exonerated years later through DNA

testing. *Mills*, 869 F.3d at 481–82; *Gregory*, 444 F.3d at 731–35. In both, the plaintiffs alleged that scientific analysts had lied about the scientific evidence used to convict them (DNA evidence in one case, hair analyses in the other). *Mills*, 869 F.3d at 481–82; *Gregory*, 444 F.3d at 749–50. Without this doctored evidence, the probable cause for the plaintiffs' detentions would have "collapsed," *Mills*, 869 F.3d at 481, or "been destroyed," *Gregory*, 444 F.3d at 750. This case might mirror *Mills* and *Gregory* if Jones had argued that Murray falsified the evidence connecting Jones's IP address to the downloaded child pornography. But another officer conducted that part of the investigation. And the later forensic evidence on which Jones relies was inconclusive, not exonerating.

That leaves two loose ends. The majority notes that a fact question exists over "whether Murray 'knowingly or recklessly' withheld" the forensic-examination results from the prosecutors. Maj. Op. 13 (quoting *Mills*, 869 F.3d at 480). I agree that a dispute of fact exists on when Murray told the prosecutors about the results, but I do not think it matters. Murray testified that he "made" the prosecution "immediately aware as soon as [he] got the report back." Years later, the prosecutors could not recall the date Murray told them and their files contained no records of the results. Even if Murray intentionally or recklessly delayed disclosing the results, though, this fact concerns a different element of Jones's claim—whether Murray "'ma[d]e, influence[d], or participate[d]'" in the decision to continue to detain him. *Mills*, 869 F.3d at 480 (citation omitted). Indeed, the fact that this alleged withholding of evidence must be knowingly or recklessly done proves that this requirement does not fall within the probable-cause element. It is black-letter law that probable cause is "an objective standard." *Wesby*, 138 S. Ct. at 584 n.2. If a seizure is "objectively justified," probable cause exists no matter Murray's subjective intent. *al-Kidd*, 563 U.S. at 740; *Whren*, 517 U.S. at 813. And here, an objectively reasonable officer could conclude that the seizure continued to be justified.

The majority also suggests that the probable-cause issue is not suited for a summary-judgment resolution because a jury should decide the ultimate question whether probable cause continued to exist after the forensic-examination results. Maj. Op. 13 (citing *Gregory*, 444 F.3d at 750). Our § 1983 cases have not spoken with one voice on this issue. We have said "[w]hen no material dispute of fact exists, probable cause determinations are legal determinations that

should be made by a court." *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005). But we have also treated the question as factual. *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002); *see also McKenna v. Edgell*, 617 F.3d 432, 441 (6th Cir. 2010). I tend to think it is a legal question. *Ornelas v. United States*, 517 U.S. 690, 697–99 (1996); *see Muehler v. Mena*, 544 U.S. 93, 98 n.1 (2005). In any event, I would follow the Supreme Court's most recent teachings in *Wesby*. There, the district court had granted summary judgment to § 1983 plaintiffs on the ground that police officers lacked probable cause to arrest them. 138 S. Ct. at 584. The Supreme Court reversed, concluding that the officers were entitled to summary judgment both because they had probable cause and because they were entitled to qualified immunity. *Id.* at 589, 593. *Wesby* tells us that officers are entitled to qualified immunity on this probable-cause issue at the summary-judgment stage when, "looking at the entire legal landscape," a reasonable officer could have concluded that probable cause existed. *Id.* at 593. That is the case here.

II

My view on this probable-cause question avoids the need to consider any other element of Jones's "malicious-prosecution" claim under the Fourth Amendment. Given that the majority addresses some of those elements, I add a few thoughts about our caselaw in light of the Supreme Court's *Manuel* decision. And my resolution of Jones's Fourth Amendment claim also leaves his state-law claim for malicious prosecution subject to further analysis. I discuss both briefly in turn.

A

Under our precedent, a plaintiff pursuing a claim that a defendant engaged in a "malicious prosecution" in violation of the Fourth Amendment must satisfy four elements. *See Sykes*, 625 F.3d at 308–09. The plaintiff must show that (1) the defendant made, influenced, or participated in the decision to initiate a criminal prosecution against the plaintiff; (2) probable cause did not exist for the prosecution; (3) the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor. *See King*, 852 F.3d at 580. We have added that the Fourth Amendment contains "two types" of these claims. *Jackson v. City of Cleveland*, 925 F.3d 793, 820 n.15 (6th Cir. 2019). One exists for the

"wrongful institution of legal process" without probable cause and the other for the "continued detention without probable cause" when, for example, new exculpatory evidence comes to light. *Id.*

The Supreme Court, however, "has not yet decided whether there is a cognizable claim for malicious prosecution under the Fourth Amendment." *Howse v. Hodous*, 953 F.3d 402, 408 n.2 (6th Cir. 2020); *cf. McDonough v. Smith*, 139 S. Ct. 2149, 2156 nn.2–3 (2019). And our cases have long bemoaned the "malicious-prosecution" label. We have said that this label is "somewhat of a misnomer," *Gregory*, 444 F.3d at 747, calling it "both unfortunate and confusing," *Sykes*, 625 F.3d at 310 (citation omitted). But we found ourselves "'stuck with that label' in part because of its use by the Supreme Court and other circuits." *King*, 852 F.3d at 580 (citation omitted).

I agree that the common-law elements of this malicious-prosecution tort fit uncomfortably with the Fourth Amendment's text barring "unreasonable" "seizures." U.S. Const. amend. IV. The tort focuses on a prosecution; the text focuses on a seizure. The tort requires subjective maliciousness; the text requires objective unreasonableness. But it is not clear to me that we are "stuck" with this label after the Supreme Court's recent *Manuel* decision. There, the plaintiff argued that the government had arrested and detained him for 48 days "based solely on false evidence" that did not establish probable cause from the outset of his detention. 137 S. Ct. at 917. The dissent in *Manuel* affirmatively detailed why the Fourth Amendment's text conflicts with the elements of the common-law tort of malicious prosecution. *See id.* at 923–26 (Alito, J., dissenting). The majority conspicuously avoided that label and did not respond to the dissent's arguments when holding that Manuel stated a Fourth Amendment claim. *See id.* at 917–20. It instead reasoned simply that "[t]he Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause." *Id.* at 918.

*Manuel* thus might free us of the malicious-prosecution framework. As the Seventh Circuit said on remand in that case: "After *Manuel*, 'Fourth Amendment malicious prosecution' is the wrong characterization. There is only a Fourth Amendment claim—the absence of probable cause that would justify the detention." *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018) (Easterbrook, J.). And while "[t]here is no such thing as a constitutional right not to

be prosecuted without probable cause," "there *is* a constitutional right not to be held in custody without probable cause." *Id.* (citation omitted); *see also Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019); *cf. Pagán-González v. Moreno*, 919 F.3d 582, 608–09 (1st Cir. 2019) (Barron, J., concurring). Yet I would leave *Manuel*'s possible effect for another day. Any potential framing of Jones's claim includes a probable-cause element, and Murray is entitled to qualified immunity on that element.

B

The states may offer greater liberty protections to their citizens than the protections provided by the Constitution and § 1983. *Virginia v. Moore*, 553 U.S. 164, 174 (2008). Here, Jones brought a traditional tort claim for malicious prosecution under Kentucky law in addition to his federal constitutional claim. The elements of that claim, with one exception, track the elements of our constitutional tort. *See Martin v. O'Daniel*, 507 S.W.3d 1, 11–12 (Ky. 2016). The exception: Kentucky requires plaintiffs to prove that "the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice[.]" *Id.* at 11. That malice element also renders inapplicable Kentucky's qualified-immunity defense. *Id.* at 5. Unlike federal qualified immunity, which turns on the "objective reasonableness" of an officer's conduct, *Pearson*, 555 U.S. at 244, Kentucky's qualified-immunity defense requires an officer to act in subjective good faith, *Martin*, 507 S.W.3d at 5. Under state law, "if a plaintiff can prove that a police officer acted with malice, the officer has no immunity; if the plaintiff cannot prove malice, the officer needs no immunity." *Id.*

My qualified-immunity conclusion that an objective officer could believe that probable cause continued to exist after January 2014 for Jones's constitutional claim thus does not dispose of Jones's state malicious-prosecution claim. The latter claim makes Murray's good faith critical. Besides, state courts need not interpret the legal elements for a state tort suit in lockstep with the way in which federal courts interpret the same elements for a federal constitutional claim. So I would follow our usual approach when we reject a federal claim. "Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims." *Sussman v. Dalton*, 552 F. App'x 488, 493 (6th Cir. 2014). Instead, the federal dismissal

"creates a presumption in favor of dismissing, without prejudice, any remaining state-law claims." *See Sampson v. Village of Mackinaw City*, 685 F. App'x 407, 418 (6th Cir. 2017); *see also Nails v. Riggs*, 195 F. App'x 303, 312–13 (6th Cir. 2006). I thus would direct the district court to dismiss the state-law claim without prejudice to Jones's ability to refile it in state court. *See Faughender v. City of North Olmsted*, 927 F.2d 909, 917 (6th Cir. 1991).

\* \* \*

For the foregoing reasons, I concur in the majority opinion in part and dissent in part.